1

**ROBERT J. ROSATI** #112006
e-mail: robert@erisalg.com

2

ERISA Law Group, LLP
6485 N. Palm Ave., Ste. 105

3

Fresno, CA 93704
Telephone:(559) 478-4119

4

Telefax:(559) 478-5939
Email: robert@erisalg.com

5

Attorneys for Plaintiff,

6

JOSE CORRALES

7

UNITED STATES DISTRICT COURT FOR

8

DISTRICT OF ARIZONA

9

PRESCOTT DIVISION

10

| | |
|---|---|
| JOSE CORRALES | Case No.: |
| Plaintiff, | **COMPLAINT FOR DECLARATORY RELIEF** |
| v. | |
| FEDERAL EXPRESS CORPORATION SHORT TERM DISABILITY PLAN; FEDERAL EXPRESS CORPORATION LONG TERM DISABILITY PLAN, | |
| Defendants. | |

11

12

13

14

15

16

17

_____

18

Plaintiff JOSE CORRALES ("Plaintiff" or "Corrales") alleges as follows:

19

**JURISDICTION**

20

1.      Plaintiff's claims for relief arise under the Employee Retirement Income

21

Security Act of 1974, as amended ("ERISA"), 29 U.S.C. section 1132(a)(1) and (3).

22

Pursuant to 29 U.S.C. section 1331, this court has jurisdiction over this action because

23

this action arises under the laws of the United States of America.  29 U.S.C. section

24

1132(e)(1) provides for federal district court jurisdiction of this action.

25

**VENUE**

26

2.      Venue is proper in the District of Arizona because the acts and occurrences

27

giving rise to Plaintiff's claims for relief took place in the Arizona in that Plaintiff was

28

**COMPLAINT**

1  and is a resident of the City of Dewey, in the County of Yavapai, Arizona, when

2  Defendant terminated his short-term disability ("STD") benefits and when it denied his

3  final appeal of that decision, and denied him the opportunity to apply for long term

4  disability benefits ("LTD").  Therefore, 29 U.S.C. section 1132(e)(2) provides for venue

5  in this court.  Intradistrict venue is proper in this Court's Prescott Division.

6                                    **PARTIES**

7        3.       Plaintiff  is, and at all times relevant hereto was, a participant, as that term

8  is defined by 29 U.S.C. section 1000(7), of the Federal Express Corporation Short Term

9  Disability Plan ("the STD Plan") and the  Federal Express Corporation Long Term

10  Disability Plan ("the LTD Plan"), sometimes collectively ("The Plans"), and thereby

11  entitled to receive benefits therefrom.  Plaintiff was a participant because he was an

12  employee of Federal Express Corporation ("FedEx") which established The Plans to

13  provide certain benefits, including STD and LTD benefits, to its employees.

14        4.       The STD Plan is an employee welfare benefit plans organized and operating

15  under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

16        5.       The LTD Plan is an employee welfare benefit plans organized and

17  operating under the provisions of ERISA, 29 U.S.C. section 1001 et seq.

18        6.       The Plans are self-funded by FedEx.

19        7.       FedEx entered into an agreement with Aetna to act as claim and appeals

20  administrator as to benefits determinations for The Plans.  As relevant here, Aetna

21  exercised discretion on behalf of The Plans, administers STD and LTD claims and

22  decides STD and LTD appeals, while The Plans remained ultimately responsible for

23  paying STD and LTD benefits.

24                          **FIRST CLAIM FOR RELIEF**
                    (For Declaratory Relief That Plaintiff Is Entitled to Benefits–
25                          Against Defendant The STD Plan)

26        8.       Plaintiff incorporates by reference Paragraphs 1 through 4, 6 and 7

27  of this Complaint.

28        9.       The STD Plan provides short-term disability benefits for up to 26 weeks

**COMPLAINT**

1  from the end of a medical absence or elimination period which cannot be less than seven

2  calendar days.

3      10.    The STD Plan has the following pertinent definitions:

4          A.    Disability is defined as:

5  Occupational Disability; provided however, a Covered
   Employee shall not be deemed to be Disabled or under a
6  Disability unless he is, during the entire period of Disability,
   under the care and treatment of a Practitioner and such
7  Disability is substantiated by significant objective findings
   which are defined as signs which are noted on test or medical
8  exam and which are considered significant anatomical,
   physiological or psychological abnormalities which can be
9  observed apart from the individual's symptoms.  In the
   absence of significant objective findings, conflicts with
10 managers, shifts and/or work place setting will not be factors
   supporting disability under the Plan.

11
           B.    Proof of Disability is defined as:
12
   No benefits shall be paid under the Plan unless and until the
13 Claims Paying Administrator has received the Covered
   Employee's application for benefits and information sufficient
14 for the Claims Paying Administrator to determine pursuant to
   the terms of the Plan that a Disability exists.  Such
15 determination shall be made in a fair and consistent manner
   for all participants in the Plan.  Such information may as the
16 Claims Paying Administrator shall determine, consist of a
   certification from the Employee's attending Practitioner's in
17 the form prescribed by the Claims Paying Administrator,
   information in the form of personal references, narrative
18 reports, pathology reports, x-rays and any other medical
   records or other information as may be required by the Claims
19 Paying Administrator.  In addition, a Covered Employee may
   be required, as the Claims Paying Administrator shall
20 determine, to submit continuing proof of disability in the form
   of the information described above, as well as evidence that
21 he continues to be under he care and treatment of a
   Practitioner during the entire period of Disability.  If, in the
22 opinion of the Claims Paying Administrator, the Practitioner
   selected by the Covered Employee cannot substantiate the
23 Disability for which a claims is being made or benefits are
   being paid hereunder, such Employee may be required to
24 submit himself to an examination by a Practitioner selected by
   the Claims Paying Administrator.  The burden of proof for
25 establishing a disability is on the Covered Employee.

26     11.    Corrales is suffering from and disabled by a seizure disorder.

27     12.    Plaintiff was employed by Federal Express Corporation as a Senior

28

**COMPLAINT**

-3-

1   Manager at the time he became disabled.  In his role as a Senior Manager, Corrales'

2   duties were to plan, organize, direct and control all operations of one or more additional

3   stations other than the domicile location within the service area of the station in a way the

4   provides maximums service to customers while maintaining a cost effective station

5   operation.

6        13.    Plaintiff last worked on June 20, 2016.

7        14.    Corrales applied for and was thereafter granted STD benefits effective July

8   20, 2016.

9        15.    On September 21, 2016, Stephen Fried, MD, reviewed Corrales'

10  claim and submitted a report that is on both MLS and Aetna letterhead, that Corrales'

11  9/21/2016 MRI showed left frontal encephalomalacia, possibly post traumatic and an

12  MRI of 12/13/15 showed similar findings.  Dr. Fried's report noted, "The claimant reports

13  being under significant stress at work, with up to 70 hours work weeks.  He reports

14  approximately one convulsive and 2-3 partial seizures weekly. . . . Based on the

15  documentation and job description there is 'significant objective' clinical documentation

16  that reveals a functional impairment that would preclude this claimant from performing

17  the essential duties of his occupation which is a sedentary demand level, from 7/20/16 to

18  9/16/16.  The claimant was having frequent breakthrough seizures on medication, and

19  was not able to maintain a 70 hour work week with significant accompanying factors.

20  Once his seizures are under better control return to work can be expected."

21       16.    On January 18, 2017, Joseph Jares, III, MD, reviewed Corrales claim and

22  submitted a report that is on both MLS and Aetna letterhead, that Corrales saw Dr. Jay

23  Varma on November 29, 2017, who provided Dr. Jares a summary of the visit, giving

24  Corrales' medical history, noting Corrales reported problems with poor balance, falling,

25  word finding difficulties, intermittent vision loss to the left eye and area of gliosis in the

26  left frontal lobe.  Dr. Varma's impression was focal epilepsy with impairment of

27  consciousness, intractable, and recommended continuation of Oxcarbazepine three times

28  a day.  They discussed possible evaluation for epilepsy surgery and follow up in three

**COMPLAINT**

1  months. Dr. Jares spoke to Dr. Varma who stated he was unaware that Corrales was not

2  working, he had not put restrictions or limitations on his activities and that he did not feel

3  restrictions and limitations from working were necessary.  Dr. Jares opined that the

4  records "do not support ongoing restrictions on the claimant from performing his won

5  occupation of a sedentary demand level from November 30, 2016 through January 1,

6  2017."

7        17.     By letter dated January 23, 2017, Aetna, on behalf of the STD Plan

8  terminated Corrales' STD benefits effective November 29, 2016.

9        18.     By letter dated March 14, 2017, Plaintiff appealed the termination of his

10  STD disability benefits.  In that appeal, Corrales explained:

11              A.     In 1977 he was involved in a very serious motor vehicle accident that

12                     caused severe head trauma.  He was sent to rehabilitation to learn

13                     how to walk and talk again.

14              B.      In 1999, in front of about 50 people, Corrales experienced his first

15                     seizure in which his body became tonic, his arms clutched inward

16                     and he fell to the ground unconscious.  After several convulsions he

17                     became limp.

18              C.     While in the emergency room, there was an MRI done that lead to a

19                     diagnosis of post-traumatic epilepsy with evidence of head trauma

20                     and scar tissue.

21              D.     Corrales has had multiple trips to the emergency room because of

22                     seizures.  The number of seizures he experiences increases with

23                     sleep deprivation and stress.

24              E.     He was approved for STD benefits based on his physician's note

25                     excusing him from work for 90 days and the December 6, 2013,

26                     MRI.

27              F.     He went back to work on October 16, 2016, even through he had

28                     been approved for STD benefits through February, 2017.  He

**COMPLAINT**

1  returned to work because he was aware that he would displaced from

2  his position at his station if he was out for more than 90 days.

3  G.  After returning to work for three consecutive 14-hour work days, he

4  suffered a double seizure at home and taken to the emergency room.

5  H.  Corrales was put back on disability on October 20, 2016.

6  I.  Corrales requested a referral to Barrow Neurological Center in an

7  effort to figure out if there was a better way to manage his seizures.

8  He was sent to see Dr. Jay Varma on November 29, 2016.  The visit

9  consisted of a 10-minute physical, which, as always, he passed, and a

10  40-minute medical history interview.  Dr. Varma scheduled a 7-day

11  inpatient EEG study for February 2017.

12  J.  The next day, November 30, 2016, Aetna contacted Dr. Varma, the

13  physician who had seen Corrales only one time.  Aetna did not

14  contact the neurologist who had been treating Corrales for eight

15  years.

16  K.  Asked how Aetna expected Dr. Varma to provided a substantiated

17  opinion when he had only examined Corrales for 10 minutes with no

18  additional testing done yet.

19  L.  That Aetna asked Dr. Varma if Corrales could perform a sedentary

20  job, when Corrales job was not sedentary – it required him to visit

21  seven FedEx stations at least twice a month, some of which were up

22  to 3.5 hours from his base station.  Corrales cannot risk driving

23  anywhere and must be driven around by his wife.

24  M.  Corrales' neurologist considered him totally disabled without

25  question.

26  N.  That he had another MRI done on September 2, 2016, because Aetna

27  said the 2013 MRI was not recent enough.  The November 2016

28  MRI showed "a small area of encephalomalacia is again noted

**COMPLAINT**

1    laterally in the left frontal lobe, possibly post traumatic given history

2    of remote motor vehicle accident."

3    O.    His seven day stay for the EEG clinic did not show an "epileptic

4    seizure" that registered on the scalp EEG, but Corrales did have six

5    events during his stay, that "in light of his abnormal background

6    EEG and abnormal MRI, these could have been partial seizures that

7    were not seen on scalp EEG."

8    P.    He was found to have slow brain wave activity in the left temporal

9    lobe of his brain and abnormal EEG activity indicated genetic

10    predisposition to generalized epilepsy.

11    Q.    Two psychogenic non-epileptic events were captured during the

12    admission.

13    R.    The St. Joseph's hospital discharge report noted that in addition to

14    extreme stress and sleep deprivation, computer screens can trigger

15    seizures.  When he is not driving for FedEx, he is sitting in front of a

16    computer screen at least 8-10 hours a day.

17    19.    In response to Corrales' appeal of the termination of his STD benefits,

18    Aetna obtained a review of Corrales' records, dated April 30, 2017, by Edward Chai,

19    MD, whose report was on both Aetna and RRS letterhead.  Dr. Chai noted he spoke with

20    Corrales' treating neurologist, Dr. MacKenzie, who stated Corrales has diagnoses of

21    seizure disorder and non-epileptic seizures.  Dr. MacKenzie reportedly stated Corrales

22    had personality changes from the head trauma that were causing great stress that might

23    restrict him from working but those issues were not of a neurological nature.  Dr. Chai

24    opined that there was no significant objective clinical documentation that reveals a

25    functional impairment that would preclude Corrales from performing the essential duties

26    of their own occupation which is sedentary in nature.

27    20.    On June 8, 2017, Dr. Chai submitted an addendum, again on both RRS and

28

**COMPLAINT**

1   Aetna letterhead, concerning the fact that Corrales' job involved travel and lifting up to

2   20 pounds.  Dr. Chai opined that there was no significant objective clinical

3   documentation that precluded Corrales from performing the essential duties of his own

4   occupation which is of a light physical demand.  He also wrote: "Due to the claimant's

5   noted seizure disorder (10/26/2016) the claimant's ability to drive would be determined

6   by his states regulation.  This would indicate the time-frame the claimant would need to

7   be seizure free."

8          21.    By letter dated June 30, 2017, Aetna denied Corrales' appeal of the

9   termination of his STD benefits.

10         22.    Aetna's claim notes are silent on the subject of driving, but the denial of

11  appeal letter noted Corrales was diagnosed with seizure disorder and continued to be

12  symptomatic, but the clinical data did not indicate any significant neurological conditions.

13  Aetna noted that Corrales was required to drive 200 miles every week.  "However, as

14  noted above, no significant objective findings were provided to support a functional

15  impairment effective 11/30/16."

16         23.    This court should review this claim *de novo* because Aetna, the party which

17  decided Corrales' appeal, was not properly delegated authority to do so.

18         24.    If for any reason the Court concludes that review is for abuse of discretion,

19  then this Court should review The STD Plan's decision with limited deference because:

20                A.    It failed to comply with ERISA's procedural requirements regarding

21                      benefit claims procedures and full and fair review of benefit claim

22                      denials.

23                B.    It refused to consider all evidence presented by Plaintiff in the course

24                      of his appeal.

25                C.     It used MLS as a vendor for reviewing Corrales' claim for benefits.

26                      MLS is known to change physician reports to support the termination

27                      of disability benefits.

28

**COMPLAINT**

-8-

1

2

3

     D.     It used  RRS as a vendor for reviewing Corrales' appeal of the termination of his claim for benefits.  RRS is known to change physician reports to support the termination of disability benefits.

4

5

     E.     It relied upon a factually unsubstantiated medical reviews that were provided by Aetna's hired physicians.

6

7

8

     25.     The STD Plan's termination of Plaintiff's short-term disability benefits was arbitrary and capricious, an abuse of discretion and in violation of the terms of The STD Plan.

9

10

     26.     Plaintiff has exhausted all administrative remedies required to be exhausted by the terms of the Plans and by ERISA.

11

12

13

     27.     At all times mentioned herein Plaintiff was, and continues to be, totally disabled under The STD Plan's definition of totally disabled and therefore entitled to benefits under the terms of The STD Plan.

14

     28.     ERISA section 503, 29 U.S.C. section 1133 provides:

15

16

"In accordance with regulations of the Secretary, every employee benefit plan shall–

17

18

(1)     provide adequate notice in writing to any participant, beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reason for such denial, written in a manner calculated to be understood by the participant, and

19

20

21

(2)     afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

22

23

24

     29.     Defendant was required to provide Plaintiff a full and fair review of his claim for benefits pursuant to 29 U.S.C.  §1133 and its implementing Regulations. Specifically:

25

26

27

28

     A.     29 U.S.C. §1133 mandates that, in accordance with the Regulations of the Secretary of Labor, every employee benefit plan, including defendants herein, shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has

**COMPLAINT**

1   been denied, setting forth the specific reasons for such denial, written

2   in a manner calculated to be understood by the participant and

3   afforded a reasonable opportunity to any participant whose claim for

4   benefits has been denied a full and fair review by an appropriate

5   named fiduciary of the decision denying the claim.

6   B.   The Secretary of Labor has adopted Regulations to implement the

7   requirements of 29 U.S.C. §1133.  These Regulations are set forth in

8   29 C.F.R. §2560.503-1 and provide, as relevant here, that employee

9   benefit plans, including Defendant, shall establish and maintain

10   reasonable procedures governing the filing of benefit claims,

11   notifications of benefit determinations, and appeal of adverse benefit

12   determinations and that such procedures shall be deemed reasonable

13   only if:

14   i.   Such procedures comply with the specifications of the

15   Regulations.

16   ii.   The claims procedures contain administrative processes and

17   safeguards designed to ensure and to verify that benefit

18   determinations are made in accordance with governing plan

19   documents and that, where appropriate, The Policy provisions

20   have been applied consistently with respect to similarly

21   situated claimants.

22   iii.   Written notice is given regarding an adverse determination

23   (i.e., denial or termination of benefits) which includes: the

24   specific reason or reasons for the adverse determination; with

25   reference to the specific plan provisions on which the

26   determination is based; a description of any additional

27   material or information necessary for the claimant to perfect

28   the claim and an explanation of why such material or

**COMPLAINT**

1   information is necessary; a description of The Policy's review

2   procedures and the time limits applicable to such procedures,

3   including a statement of the claimant's right to bring a civil

4   action under section 502(a) of ERISA following a denial on

5   review; if an internal rule, guideline, protocol, or similar

6   criterion was relied upon in making the adverse

7   determination, either the specific rule, guideline, protocol, or

8   other similar criterion or a statement that such a rule,

9   guideline, protocol, or other similar criterion was relied upon

10   in making the adverse determination and that a copy of such

11   rule, guideline, protocol, or other criterion will be provided

12   free of charge to the claimant upon request.

13   iv.   The plan is required to provide a full and fair review of any

14   adverse determination which includes:

15   a.   That a claimant shall be provided, upon request and

16   free of charge, reasonable access to, and copies of, all

17   documents, records, and other information relevant to

18   the claimant's claim for benefits.

19   b.   A document, record, or other information shall be

20   considered "relevant" to a claimant's claim if such

21   document, record, or other information: (1) was relied

22   upon in making the benefit determination; (2) was

23   submitted, considered, or generated in the course of

24   making the benefit determination, without regard to

25   whether such document, record, or other information

26   was relied upon in making the benefit determination;

27   (3) demonstrates compliance with the

28

**COMPLAINT**

1  administrative processes and safeguards required

2  pursuant to the Regulations in making the benefit

3  determination; or (4) constitutes a statement of policy

4  or guidance with respect to the plan concerning the

5  denied benefit without regard to whether such

6  statement was relied upon in making the benefit

7  determination.

8  c.  The Regulations further provide that for a review that

9  takes into account all comments, documents, records

10  and other information submitted by the claimant

11  relating to the claim, without regard to whether such

12  information was submitted or considered in the initial

13  benefit determination;

14  d.  The Regulations further provide that, in deciding an

15  appeal of any adverse determination that is based in

16  whole or in part on a medical judgment that the

17  appropriate named fiduciary shall consult with a

18  healthcare professional who has appropriate training

19  and experience in the field of medicine involved in the

20  medical judgment.

21  e.  The Regulations further require a review that does not

22  afford deference to the initial adverse benefit

23  determination and that is conducted by an appropriate

24  named fiduciary of the Plan who is neither the

25  individual who made the adverse benefit determination

26  that is the subject of the appeal nor the subordinate of

27  such individual.

28

**COMPLAINT**

1

2

3

4

5

6

7

        f.       The Regulations further provide that a healthcare professional engaged for the purposes of a consultation for an appeal of an adverse determination shall be an individual who is neither the individual who was consulted in connection adverse benefit determination which was the subject of the appeal nor the subordinate of any such individual.

8          30.    Defendant denied Plaintiff a full and fair review of his claim for benefits

9  as follows:

10          A.    Aetna has claims procedures which contain administrative processes and safeguards designed to ensure and to verify that benefit determinations are made in accordance with governing plan documents and that, where appropriate, the plan's provisions have been applied consistently with respect to similarly situated claimants, but refused to provide them to Corrales.

16          B.    Aetna, when terminating Plaintiff's claim for STD benefits, did not provide a description of the additional material or information necessary for Plaintiff to perfect his claim or an explanation as to why material previously submitted and relied upon in approving Corrales disability was no longer adequate, especially since the updated MRI gave the same results as the earlier one.

22          C.    Aetna failed and refused to provide all relevant documents to Plaintiff for use in his appeals.  Specifically, Aetna withheld relevant records, including, but not limited to:

25                (i)     Claims procedures as specified in Paragraph 29;

26                (ii)    Statements of policy or guidance with respect to the plan concerning the denied benefit without regard to whether or

28

**COMPLAINT**

1         not the statement was relied upon in making the benefit

2         determination, as specified in Paragraph 29.

3       D.    Aetna did not consider the comments and documents submitted in

4         support of Plaintiff's appeals.

5       E.    Aetna failed to provide Plaintiff with templates of the physician

6         reviews;

7       F.    Aetna failed to provide the reviewing physicians communications

8         and time records regarding their work, which documents are relevant

9         to Corrales' claim for benefits.

10      G.    Aetna otherwise violated the Regulations.

11      31.    An actual controversy has arisen and now exists between Plaintiff and

12  Defendant with respect to whether Plaintiff is entitled to STD benefits under The STD

13  Plan.

14      32.    Plaintiff contends, and The STD Plan disputes, that Plaintiff is entitled to

15  the remaining STD benefits under the terms of The STD Plan because Plaintiff contends,

16  and Defendant The STD Plan disputes, that Plaintiff is totally disabled.

17      33.    Plaintiff desires a judicial determination of his rights and a declaration as to

18  which party's contention is correct, together with a declaration that Defendant STD Plan

19  is obligated to pay remaining short-term disability benefits and long-term disability

20  benefits of The STD Plan, retroactive to the first day his benefits were terminated, until

21  and unless such time that Plaintiff is no longer eligible for such benefits under the terms

22  of The STD Plan.

23      34.    A judicial determination of these issues is necessary and appropriate at this

24  time under the circumstances described herein in order that the parties may ascertain

25  their respective rights and duties, avoid a multiplicity of actions between the parties and

26  their privities, and promote judicial efficiency.

27      35.    As a proximate result of Defendant The STD Plan's wrongful conduct as

28

**COMPLAINT**

1    alleged herein, Plaintiff was required to obtain the services of counsel to obtain the

2    benefits to which he is entitled under the terms of The STD Plan.  Pursuant to 29 U.S.C.

3    section 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as

4    compensation for costs and legal fees incurred to pursue Plaintiff's rights.

5                    **SECOND CLAIM FOR DECLARATORY RELIEF**
     (For Declaratory Relief That Plaintiff Is Eligible to Apply for and Entitled to Benefits–
6                    Against Defendant The LTD Plan)

7            36.      Plaintiff incorporates by reference Paragraphs 1 through 3, 5 through 7, 11

8    through 22, and 28 through 30 of this Complaint.

9            37.      The LTD Plan provides long-term disability benefits after 26 weeks of

10   disability through the claimant's 65th birthday, of 60% of his basic monthly

11   compensation up to a maximum disability benefit of $7,500 per month less application

12   reductions for other income benefits.

13           38.      The LTD Plan has the following pertinent definitions:

14           A.      Section 1.1(u) defines Occupational disability is defined as:

15   The inability of a Covered Employee, because of a medically-
     determinable physical impairment or Mental Impairment
16   (other than an impairment caused by a Chemical
     Dependency), to perform the duties of his regular occupation.
17   With respect to a Cre Member whose Disability
     Commencement Date is on or after May 31, 1999,
18   Occupational Disability shall include an impairment caused
     by a Chemical Dependency, but only to the extent provided
19   under Section 3.3(b) herein.  Occupational Disability shall
     include a natural physical deterioration which impairs a
20   Covered Employee's ability in connection with his duties in
     the operation or maintenance of an aircraft, vehicle or other
21   such equipment requiring licensing for its operation or
     maintenance and which results in the revocation of such
22   license and denial of restoration thereof.

23           B.      Section 1.1(gg) defines Total disability as:

24   The complete inability of a Covered Employee, because of a
     medically-determinable physical impairment (other than an
25   impairment caused by a mental or nervous condition or a
     Chemical Dependency), to engage in employment for twenty-
26   five hours per week for which he is reasonably qualified (or
     could reasonably become qualified) on the basis of his ability,
27   education, training or experience.

28           C.      Section 1.1(t) defines Mental impairment as:

**COMPLAINT**

1

2

3

4

A psychiatric or psychological condition, which is usually treated by a mental health Practitioner or other qualified Practitioner who uses psychotherapy, psychotropic drugs or other similar modalities.  Such conditions include, but are not limited to, the following: schizophrenia, depression, personality disorder, mental stress, adjustment disorder, anxiety, manic depression, bipolar disorder.

5

6

7

Mental disorder does not include conditions which usually are not treated in the above manner.  Such conditions include, but are not limited to, dementia if caused by stroke, trauma, viral infection or Alzheimer's disease.

8

D.      Section 5.3(b) Claims review provides:

9

10

11

12

Every claimant with respect to whom a claim is denied, or his Authorized Representative (as defined in Section 5.3(e), shall, upon receipt of the written notice of denial as provided in Subsection (a), have the right to:
(1)      request the appeal committee referred to in Subsection (c) to review the denial of benefits provided that such review is requested in a writing which must be sent to Administrator within 180 days. . ."

13

14

15

16

The appeal committee described in Subsection (c) may appoint a subcommittee, subcommittees or an individual to review certain matters as described in the appeal committee's minutes and such subcommittee, subcommittees or individual shall perform the review described in this Subsection (c) and shall have the authority described in Subsection (d) with respect to all matters it reviews.

17

18

E.      Section 5.3(d) Authority of Appeal Committee provides:

19

20

21

22

23

24

Subject to the requirements of the Internal Revenue Code of 1986, as amended (the 'Code') and the Employee Retirement Security Act of 1974, as amended ('ERISA'), be empowered to interpret the Plan's provisions in it's (*sic*) sole and exclusive discretion in accordance with its terms with respect to all matters properly brought before it pursuant to this Section 5.3, including, but not limited to, matters relating to eligibility of a claimant for benefits under the Plan.  The determination of the appeal committee shall be made in a fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only to a determination by a court of competent jurisdiction that the committee's decision was arbitrary and capricious.

25

F.      Section 6.1 The LTD Plan administrator is:

26

27

28

The named fiduciary of the Plan and shall have the absolute right and power to construe and interpret the provisions of the Plan and administer it for the best interest of Employees. However, the committee named by the Administrator in

**COMPLAINT**

1   Section 5.3, or any subcommittee appointed by such committee, shall have the rights and power given to it

2   pursuant to that Section 5.3. Except as limited by the preceding sentence and by Section 6.2 below, and subject to

3   the requirements of the Code and ERISA, and, with respect to determinations regarding a Covered Employee who is a Crew

4   Member, the terms of the Agreement (but only to the extent that the terms of the Agreement are not inconsistent with the

5   requirements of the Code and ERISA), the Administrator's authority shall include, but shall not be limited to, the

6   following powers:

7   (a)   to construe any ambiguity and interpret any provision of the Plan or supply any omission or reconcile any

8         inconsistencies in such manner as it deems proper;
    (b)   to determine eligibility for coverage under the Plan in

9         accordance with its terms; and

10  (c)   to decide all questions of eligibility for, and determine the amount, manner and time of payment of, benefits

11        under the Plan in accordance with its interpretation of its terms.

12
    G.    Section 6.2 provides the Committee is:
13
    A Committee shall be appointed by the board of directors of

14  FedEx Corporation to perform the administrative duties hereunder other than the administration of claims which is the

15  responsibility of the Administrator and Claims Paying Administrator to the extent such duties are delegated to it by

16  the Administrator. The Committee is the named fiduciary of the Plan and shall adopt such rules and regulations that in its

17  opinion are either necessary or desirable to implement and administer the Plan and to transact its business. In addition to

18  this general administrative power, the Committee shall have such powers as may be necessary to perform its duties

19  hereunder, including, without limiting the generality of the foregoing, the power to engage counsel and other agents at

20  the expense of the Trust Fund, as it shall deem appropriate, subject to the requirements of the Code and ERISA, and with

21  respect to determinations regarding a Covered Employee who is a Crew Member, the terms of the Agreement (but only to

22  the extent that the terms of the Agreement are not inconsistent with the requirements of the Code and ERISA. . . . The

23  Committee shall keep or cause to be kept records of its proceedings and decisions and shall keep such other records

24  and data as may be necessary for the proper administration of its duties. All decision of the Committee shall be made in a

25  fair and consistent manner in accordance with the Plan's terms and its decision shall be final, subject only: (I) with

26  respect to any Covered Employee who is not a Crew Member, to a determination by a court of competent jurisdiction that

27  the Administrator's decision was arbitrary and capricious, or (ii) with respect to any Covered Employee who is a Crew

28  Member, to a determination that is consistent with the terms

**COMPLAINT**

1  of the Agreement, but only to the extent that such
2  determination is not inconsistent with the requirements of the
   Code and ERISA.

3      H.      Section 1.1(e) explains the Claims Paying Administrator is:

4  Kemper National Services or any other entity or person
   designated as such by the Company.
5
       I.      Section 1.1(n) provides an Eligible employee is defined as:
6
7  A pilot, crew member or an employee who is engaged in
   Permanent Full-Time Employment with a Sponsoring
   Employer, other than: (1) an Employee domiciled in the U.S.
8  Virgin Islands or Guam, or (2) a Pilot, Crew Member or other
   Employee who is included in a Bargain Unit, unless the
9  collective bargaining agreement to which such Pilot or Crew
   Member or Employee is subject specifically incorporates the
10 Plan.

11     39.     By email dated July 31, 2017, Corrales requested that Aetna send

12 him the application for LTD benefits.  By email dated August 1, 2017, Aetna responded

13 to Corrales' request by quoting the 2017 LTD Plan, Section 3.3, "Commencement of

14 Benefits.  The disability benefits shall commence to accure (*sic*) on the day following the

15 conclusion of all benefits payable to the disabled covered employee pursuant to the

16 Federal Express Corporation Short Term Disability Plan on account of the same condition

17 for which benefits are payable hereunder and shall be payable monthly during

18 continuation of Disability as provided.  I am sending you an LTD packet application. . ."

19 By letter dated August 2, 2017, Aetna sent Corrales an application for LTD benefits

20 stating that, "If your disability continues, your last day of Short Term Disability (STD)

21 will be 1/20/17.  We recommend that you now begin the process for filing for Long Term

22 Disability (LTD) benefits.  You must complete and return your LTD forms. . . .  The

23 enclosed forms must be completed and returned to Aetna within three weeks."  By email

24 dated August 18, 2017, Aetna wrote, "Due to your STD claim being denied, you would

25 not be eligible for LTD as per your plan you have to exhaust STD benefits to be eligible

26 for LTD."

27     40.     The LTD Plan's refusal to consider Corrales' application for LTD benefits

28

**COMPLAINT**

-18-

1  was arbitrary and capricious, an abuse of discretion, and a violation of the terms of The

2  LTD Plan.  The LTD Plan provides that, "The disability benefits shall commence to

3  accrue on the day following the conclusion of all benefits payable to the disabled covered

4  employee pursuant to the Federal Express Corporation Short Term Disability Plan on

5  account of the same condition for which benefits are payable hereunder and shall be

6  payable monthly during continuation of Disability as provided."  This provision states

7  that LTD benefits become payable the day after the last day that STD benefits are

8  "payable" not "have been paid to exhaustion."  Corrales is an eligible covered employee

9  for LTD benefits.  Aetna should have considered his application for LTD benefits.

10       41.     Plaintiff has exhausted all administrative remedies required to be exhausted

11  by the terms of the Plans and by ERISA.

12       42.     At all times mentioned herein Plaintiff was, and continues to be, totally

13  disabled under The LTD Plan's definitions of totally disabled and therefore entitled to

14  benefits under the terms of The LTD Plan and was eligible to apply for such benefits.

15       43.     The LTD Plan acted in an arbitrary and capricious manner when it refused

16  to consider Corrales' application for LTD benefits.

17       44.     An actual controversy has arisen and now exists between Plaintiff and

18  Defendant The LTD Plan with respect to whether Plaintiff is eligible to apply for and

19  entitled to LTD benefits under The LTD Plan.

20       45.     Plaintiff contends, and The LTD Plan disputes, that Plaintiff : (a) is eligible

21  to apply for LTD benefits; and (b) is entitled to LTD benefits under the terms of The LTD

22  Plan because Plaintiff contends, and Defendant The LTD Plan disputes, that Plaintiff is

23  totally disabled, and is and was eligible to apply for LTD benefits because The LTD Plan

24  does not require that he receive STD benefits, only that he complete the waiting period.

25       46.     Plaintiff desires a judicial determination of his rights and a declaration as to

26  which party's contentions are correct, together with a declaration that Defendant The LTD

27  Plan is obligated to: (a) consider Corrales' LTD application and (b) to pay long-term

28  disability benefits of The LTD Plan, retroactive to the first day his benefits were denied,

**COMPLAINT**

1  until and unless such time that Plaintiff is no longer eligible for such benefits under the

2  terms of The LTD Plan.

3      47.    A judicial determination of these issues is necessary and appropriate at this

4  time under the circumstances described herein in order that the parties may ascertain their

5  respective rights and duties, avoid a multiplicity of actions between the parties and their

6  privities, and promote judicial efficiency.

7      48.    As a proximate result of Defendant The LTD Plan's wrongful conduct as

8  alleged herein, Plaintiff was required to obtain the services of counsel to obtain the

9  benefits to which he is entitled under the terms of The LTD Plan.  Pursuant to 29 U.S.C.

10  section 1132(g)(1), Plaintiff requests an award of attorney's fees and expenses as

11  compensation for costs and legal fees incurred to pursue Plaintiff's rights.

12      WHEREFORE, Plaintiff prays judgment as follows:

13      1.    For declaratory judgment against Defendant, The STD Plan, requiring

14  Defendant The STD Plan to pay short-term disability benefits through exhaustion.

15      2.    For declaratory judgment against Defendant The LTD Plan requiring it to

16  consider Corrales' claims for LTD benefits under the terms of The LTD Plan and to pay

17  Plaintiff for the period to which he is entitled to such benefits, with prejudgment interest

18  on all unpaid benefits, until Plaintiff attains the age of 65 years or until it is determined

19  that Plaintiff is no longer eligible for benefits under the terms of The LTD Plan.

20      3.    For attorney's fees pursuant to statute against both defendants.

21      4.    For costs of suit incurred against both defendants.

22      5.    For such other and further relief as the Court deems just and proper.

23

24  DATED: October 10, 2017                    *s/Robert J. Rosati*
                                              ROBERT J. ROSATI
25                                            Attorney for Plaintiff,
                                              JOSE CORRALES
26

27

28

**COMPLAINT**